Number 2313847 Oaks Farm Food & Distribution Services, LLC versus Gregory Adkins. May it please the Court, Steve Bracci on behalf of the appellants, Oaks and Oaks Farms Food & Distribution Services, LLC. The issue I'd like to focus on this morning is how it could be that the district court entered summary judgment in favor of the Lee County School District based on speech-related efficiency interests under the Pickering balancing test when the school district itself presented evidence and vociferous argument that the sole justification for the termination of the Oaks Farms contract had nothing to do with speech. Under the four-part test when a government entity denies termination of an employee or an independent contractor when it denies that it was based on speech, a four-part test has evolved, the first part being whether or not the speech was protected speech. In here, there's no question. Anyone bet that was the case? The second part is the Pickering balancing test. That is decided as a matter of law by the court where the court balances the justifications provided by the government agency against the free speech rights of the plaintiff. In this case, the school district argued adamantly that it did not terminate based on any speech of Mr. Oaks or Oaks Farms, but rather solely because of an investigation they conducted where they allegedly found that Oaks Farms did not have sufficient COVID-19 food safety protocols, Oaks Farm being a provider of fruits and vegetables to the school district. Oaks denies that and states that that was a pretextual reason covering for the school district to be anonymous against Mr. Oaks for his speech. Do you want us to decide this as a speech case or not? It sounds like yes, you do, right? I do because we are arguing that he was terminated for his speech and the four-part test under Bryson, it starts out by saying where the school district denies that the termination was based on speech, a four-part test has evolved. That's precisely the scenario. What I don't want is for it to be decided based on pickering because the court has a right as a matter of law to decide pickering where they balance the interests. The court does not have a right to decide what the justifications were. The adequate justifications have to be presented by the government agency. Here, they said the justification for terminating the Oaks Farms contract had nothing to do with speech. Right there, as a matter of law, the court has to decide in favor of Mr. Oaks because if he does have a First Amendment right, which is prong one, and the government goes and says, we didn't terminate him based on speech, there is no speech-related efficiency interest on their side of the scale. I think it's a little hard for me to see how you can have it both ways because if you want us to accept the government's contention that it was unrelated to speech, then I don't understand why we wouldn't accept that through all prongs of the case. It either was related to speech or it wasn't. Maybe you want us to make a decision at the outset about whether it was related to speech or not, but then once we go through the test, I don't see how we can say, well, as a starting point it was based on his speech, but then because the government says it wasn't based on his speech, they have no justification. That's where I'm losing you. You have to look at prong three and prong four, frankly, but prong three is a substantial part test. There's a four-part test that's evolved under prong three, which is the Castle v. Appalachian Technical College case. Here's the bottom line. The courts build into the process the fact that you look for pretext. They know the government is going to give some pretextual reason for why they terminated based on speech, but they're going to say it wasn't because of speech. That's the whole point, but you have to get to prong three. Prong two is the Pickering Balance Test. Let's assume that they said, yeah, Oakes' speech was disruptive. It caused problems in the community. It caused security concerns, all that stuff, which is what the court said, but they didn't say that. If it was based on speech, and they can justify it, and the court can then balance and say, okay, I can see why Mr. Oakes has a right to speech, but the government as an employer has a right to not have all this turmoil. That's not what the government said. My read of what the government says, and tell me if you agree or disagree with this, is that your client's statements alerted them to a potential problem, as they saw it, with food safety, and they investigated that and determined that there was a problem with food safety, and that's why they ended the contract. In one sense, it's speech-related because, obviously, your client's statements about COVID were what alerted them to that issue, but they're suggesting that he wasn't fired because of, or his company wasn't let go because of that speech. It was because of what that speech revealed that they later investigated. Do you disagree with that? I do agree, but I want to read one quote from CFO Decimor, who was one of the three people in the room when the decision was made. Quote, the question, as far as we were concerned, was not whether Mr. Oakes' personal beliefs were that COVID-19 existed or not. It was just related to what safety protocols is the company taking in order to prevent the transmission of COVID to students and staff, and that is the question we asked. That question has nothing to do with speech. Therefore, under Pickering, there is no speech-related efficiency interest. They had a different non-speech-related issue, which maybe that was the reason, or maybe that was pretext, and we're entitled to a jury trial on prong three, whether or not this speech was a substantial part, and whether under Castle, you start looking at indicia. The government's never going to tell you, not never, but the courts know that the government may have a propensity to come up with an excuse, and so you start looking at, under Castle, temporality. What was the timeframe between the speech and the adverse event? Here, Mr. Oakes gave his Facebook post on a Saturday morning in his own house on June 6th. I'm sorry, yes, June 6th. On June 11th, five days later, a contract that had lasted for five years was suddenly terminated. Oh, by the way, in terms of temporality, on June 2nd, just nine days before, the school board had unanimously voted to re-up the contract for the next year. So temporality under prong three substantial factor test goes in Oakes Farms' favor. Next one is pretext. Was it really the case that they found that Oakes Farms didn't have sufficient food safety protocols? Well, on Monday morning at 8 o'clock, after Mr. Oakes' Saturday morning post, we have the sworn testimony of Jim Carrasco, who worked in the procurement department, who overheard the director of produce, Fred Ross, receive a phone call and they said, find out what we need to do to cancel this contract. Well, that's strongly suggestive for a jury that the entire investigation as to Oakes Farms' safety protocols was pretextual. It had a foregone conclusion. Couldn't that also mean that they just wanted to know the technicalities of how under the contract it could be terminated? I mean, the question is which way the jury could go on that. I mean, it may be, Your Honor, but it's a jury question. Prong three is a jury question. Prong three gets decided by the fact finder, unlike prong two, which gets decided by the judge as a matter of law. We have to have a jury trial. And again, the case law based on Castle says that no one of the five factors is dispositive, but they're all supposed to be taken into consideration. So that's one of the factors, along with the temporality, along with the fact that they said it was about, that it was decided by Superintendent Atkins based solely on COVID-19. But as soon as the decision was announced, one of the other school board members comes out and says, this demonstrates our commitment to anti-racism and things of that nature. That's another prong under Castle, whether there are inconsistent statements by the government agency that suggest that this is pretextual, or that the reason was not valid, or really what it is is that this is all subjective motivation for a real retaliatory animus by the school district against Mr. Oaks. There are other factors. The school district, there's other exigent circumstances. This is another thing you look at under Castle, under the third prong. For instance, the school district never in history came out, and they admitted this, that they never publicly posted on Twitter or made an announcement when they terminated the contract. But in this case, they felt compelled to. And they were asked by the pitchfork crowd online for Mr. Oaks to be terminated, the contract to be terminated, because they wanted him to cut ties because he made racist statements about the death of George Floyd. And when they made this announcement, the school district paid homage to the pitchfork crowd by saying, we severed ties with Oaks Farms, just like cut ties and severed ties. So again, these are all matters for a jury to decide under prong three. What evidence could a jury use to determine that this decision was made based on the George Floyd statements and anger about those versus the only rationale that's reflected even in the internal documents of the board? Well, the school district had its opportunity to give the adequate justification based on pickering. It circled its wagons around the fact that it had nothing to do with speech. The question then on the table was, in prong three, so once it has nothing to do with speech, there's no speech-related deficiency interest. But listen carefully to my question. What evidence could a jury use to conclude that this decision was made on the basis of the board being upset about the George Floyd statements as opposed to the justification that's reflected on all of its internal communications, which is the COVID safety issue? Because of, again, the CASEL test, the timing of this. Right, so we have timing, but timing is consistent with both rationales, right? Yeah, the second one is that you just mentioned what the board would do. Well, I agree with you that it should have been a board decision. Instead, it was a superintendent decision. The superintendent had delegated the power of the board, which gets into the whole point that we had argued that this was all a Sunshine Law violation. So fine, but you still haven't told me any evidence. Now, I can see if I'm your client when that happens, I certainly have my suspicions, right? I can understand why he would have felt concerned. But what I'm not seeing is any evidence that that is what happened as opposed to a kind of fear that that could have happened or a suggestion that that might have happened. Do you have any specific evidence that that was the reason besides the temporal nature of the event? Yes, the fact that Jim Carrasco overheard them instructing Mr. Ross to find out a way to terminate the contract on the morning of 8.15 in the morning. So there was a predetermined outcome. That's one, Your Honor. The other one is that Amy Desimore, early in the case, there was a motion for preliminary injunction before the evidence had evolved. And she came out with this claim that Oaks Farms had been requested the information on their COVID protocols and that they were recalcitrant and they didn't respond. When the evidence came out and said that's not true, her sworn testimony that the reason they did this was Oaks hadn't responded. They were dragging their feet. The evidence came out and showed that Oaks responded in 15 minutes to the request by email and said, okay, we'll get it to you later that day. And sure enough, later that same afternoon, they provided the evidence. So Amy Desimore's sworn testimony about why they said Oaks didn't have any protocols wasn't sufficient. Also, Director Fred Ross, who was running the investigation, he said that at one point he says that Oaks didn't provide them any safety protocols because they were on that letterhead of a sister company. But then he ultimately admitted that Mr. High of Oaks Farms did, in fact, tell him These were written on another letterhead. We had to submit them just recently for a USDA inspection. But we use these same protocols. So there is sufficient evidence, Your Honor. May it please the court. My name is Chris Donovan. I'm here on behalf of the Lee County School District, as well as I also represent all of the individual defendants except for former board member Chris Petricca, who is represented by Phil Fairman. But we both agreed not to divide our time today just because the issues are so overlapping. I'll just handle the oral argument for all of the appellees. Today, I would like to try to focus on three issues and then answer any of the courts' questions. The first issue I want to talk about, the first two, are really going to dovetail into this question of whether Pickering applies. And the first issue is I want to address something in his reply brief where he suggests that the school district and, of course, all the other defendants did not address whether or not Umber applies because there was an argument that Mr. Oaks and Oaks Farms just provide some veggies and fruits. They don't have a close working relationship with the school board to fulfill any government responsibilities, which he cites the Blackburn versus City of Marshall case. Respectfully, I think that's incorrect for two reasons. One, it wasn't entirely clear to me from the brief that we were rehashing the Umber analysis of whether or not Pickering applies to independent contractors. I thought the issue was whether or not it applies to independent contractors when it was the owner's speech that was supposedly causing the adverse reaction. That somewhat confusion as to this sort of hiding the P as to whether it applied to Mr. Oaks or Oaks Farms was highlighted in my brief at page 39, footnote 4. And so Umber, though, applies to at least Oaks Farms because Pickering applies to at least Oaks Farms because Umber has already decided, the Supreme Court has already decided, that Pickering applies to independent contractors, period, full stop. We don't have to look at whether or not they're sufficiently analogous to a public employee or the Blackburn test, which was a year before Umber. And second, it's a hard argument, I think, for Mr. Oaks to argue that he had no relationship, no commercial relationship, or that Mr. Oaks Farms was not providing a critical government service through this contract because without the veggies and fruit, there would be no free service to the students, especially during COVID. So especially Pickering and Umber apply at least to Oaks Farms. But they also apply to across the board, regardless of corporate identities, otherwise there's a jurisdictional problem, I think, for Oaks Farms and Mr. Oaks. Because Umber, and you have to read Umber at the same time as you read O'Hara, which is another Supreme Court case, decided the exact same day with the same majority opinion and had the same dissenting opinion in both issues related to whether or not they were going to apply Pickering or other related type tests to independent contractors despite them not being public employees. And they applied that test regardless, across the board. They didn't consider corporate identity. They didn't consider, well, was the corporate independent contractor the speaker or was it the owner the speaker? They just applied it across the board. And after all, owners cannot genuinely claim they have no commercial interests in the contracts of their company, even if it's derivatively. Mr. Oaks himself is arguing or advocating in his complaint that the $50 million that they've lost in the termination of this contract was all because of the contract with Oaks Farms. He hasn't identified a single injury specifically to him. If Mr. Oaks was just a gentleman off the street unrelated to Oaks Farms, we wouldn't be here. The termination wouldn't have anything to do with Mr. Oaks' speech. So to find otherwise creates a jurisdictional problem. I think it should apply across the board. Or at a minimum, then Mr. Oaks doesn't have standing to vindicate his problem because his name's not on the contract. And Oaks Farm didn't commit any speech, so Oaks Farm doesn't have a constitutional challenge instead he has a simple contract breach. Let's just assume and cut to the chase that Pickering applies, that it is a speech case, and there are multiple acts of speech by Oaks in this case. One of the things that Oaks said here was that beyond saying that the pandemic was a hoax, he accused George Floyd of being a felon and so on and so forth. And then he went on and he criticized Black Lives Matter protests that resulted from Floyd's death. Suppose hypothetically that, and let's go beyond the umber and assume that Pickering applies here. Yes, sir. I want to focus on one thing that Mr. Oaks said. Oaks commented about Floyd, Black Lives Matter, et cetera. Suppose that's all he had said, and Lee County terminated the contract. Could you possibly prevail under those circumstances? Wouldn't that plainly be protected speech? If we're not going to consider COVID at all? That is correct. This truly, as I see it, is a mixed boat of case. There are two things that are said, but I want to hold aside the COVID comments for purposes of really analyzing what's going down here. Let's just look at the second half of what Oaks said. His comments about Floyd, his comments about Black Lives Matter. Suppose that's all she wrote. That's all he said. And Lee County fired him, dumped him, terminated the contract. You'd lose, wouldn't you? I mean, at least based on those facts, I'm not sure if there'd be any other facts. I'm asking you based upon the comments. There are two sets of comments. One concern COVID, the other concern Floyd and Black Lives Matter. I want to take the second piece separately. In this hypothetical. Yes, in this hypothetical, you would lose, wouldn't you? Can we also consider the other evidence that was presented related to the protests that were happening on the school board campus in response to? Assume all of that. So, but the only speech was commentary about George Floyd. Pickering applied. You think that they could terminate a contract because they didn't like his comments about a matter of public record, whether they were right or wrong, whether they were explosive or not. Wouldn't that be protected speech under the first amendment? If he's in the functionally, the same position as an employee of the United of Lee County or the federal government. I don't guess a no. I mean, yes, it's protected speech, but I think there would have been a justification still because of the threats on the school board based on those speech, as well as the protests that were disrupting. If we're, if we're allowed to consider those facts as well in this hypothetical, then there would have been a basis for justification under Pickering as well to terminate the contract. Isn't that just giving, giving rise to hecklers veto. Why would that be something that the first amendment would permit? Well, I, I think that again, it under, under the waters decision from the Supreme court, it says it's the reasonable prediction of disruption. And I don't know that we had to be reasonable prediction. We already had disruption at that point. The school board members were getting fielding emails and calls related to this, this petition asking for the termination, asking the school district to terminate based on, on their contract and they were threatened. There were actual threats on school board members lives, as I understand it. If I remember correctly from the record again, I didn't focus on this because of the health issue. But so I think there is a reasonable prediction of disruption because there was disruption aside from the COVID issues related to those. They didn't like the nature of his speech. Would that be a basis to terminate them? I can remember a time in this country where if you went back to say Brown v. Board of Education in 1954, and somebody had made a comment that other folks didn't like. Would that deprive them of the right to speak freely, even if it caused demonstrations surrounding a school board? Under the Supreme court's test, if it provides for a reasonable prediction of disruption, then that is a just, is that the kind of disruption that the Supreme court is, is dealing with in these cases? I don't, I'm not sure that's quite right. So it seems to me the better argument is even assuming arguendo, that standing alone, his commentary about Floyd and black lives matter is plainly protected speech. And if you went through all of the parts of the Pickering test, you'd lose. That wasn't what went down here, or at least that wasn't the only thing that happened here and that COVID was a valid reason based on what he had said and the subsequent actions they had taken, in which case you would have to prove on a mixed motive kind of case that they would have taken the same action anyway, right? Well, notwithstanding his speech about Floyd, they were going to terminate because they were unsatisfied with what he produced and what he said about COVID. And they were going to door to door at a time to deliver milk to kids' homes and this kind of thing. Correct. They were going to terminate because they didn't like the results of the investigation. And there was to say that it had nothing to do with this, the part of the speech related to COVID being a hoax. I don't think that's been the argument. I think that there it triggered an investigation and the results of that investigation provided a basis under the facts of that case, given what was known about COVID at the time and ever changing information and the fact that there's the superintendent said, I had, you know, I had the over a hundred, almost a hundred thousand students lives in my hands. I had to make a decision and that's what he decided, which was to terminate the contract based on a safety. Right. So that's why I'm suggesting to you that this looks to me like kind of a mixed motive case. We've got case law dealing with Pickering where there are multiple motives. His speech covered COVID, his speech covered Floyd. They had nothing to do with each other. Correct. And even assuming arguendo, they couldn't terminate him for the latter. Perhaps they could terminate him for the former. That's really the, the, the question. If you can show that they would have terminated him anyway, notwithstanding what might otherwise be protected speech about Floyd.  So what I'm asking you is what is there in this record that suggests they would have fired him anyway, they would have terminated the contract anyway. Well, I think the fact that they started an investigation related to whether or not they had sufficient safety protocols. And then after the investigation was presented to the superintendent, the superintendent made the call that I'm going to protect the students lives and terminate out of concern for whether or not they're following sufficient safety protocols. I think that evidence is in, in the record. I mean, it was resoundingly provided for by everybody who testified that that was the basis for this decision was the concerns for health safety. The, the argument that, and there's really no evidence to the contrary. The only evidence to the contrary is really a statement by Brian, the gentleman's names. Wasn't that a board member who did make a comment? I believe it was Jim Kirk. Right. But wasn't there a comment that suggested that he at least was concerned about this other speech. There was a business, right? So there's a shard of evidence going the other way, isn't there? I don't know if that's entirely. Is that overstated? I respectfully would disagree because the decision was made by the superintendent. It was his delegated decision to make his alone. He then told the school board members individually that this, one of those school board members then went and spoke and use that as an ed op with the press to make his opinion known as to, you know, what he thought of and that it was consistent with the concern that he has related to the, the, the other part of the speech, if you will. But I don't know that that is evidence of that. It affected the actual decision maker, superintendent Atkins, who had already made the decision by the time that that gentleman, that's the former school board member made comments to the press to the contrary. The only contrary evidence that we have here is a statement by Jim Carrasco where he says an unidentified speaker told Frederick Ross to let's find a way out of this, cancel this contract, which as judge prior pointed out, could be taken multiple different ways, but it's simply not admissible because it's hearsay. And the only response to the hearsay argument that was made was made in a footnote on a reply brief, which was to rely on federal rule of evidence 807. But there's two requirements for 807 to apply and that is one notice, which includes who the declarant speaker is. So he can't get an end under 807. One, there was never any notice before the summary judgment. And two, there's, there's gotta be a, a, a, a genuine, uh, showing of trustworthiness from the totality of the facts. And I don't think they've shown that. In fact, the deposition of this gentleman Carrasco was done ex parte. It was not even done with all the, uh, uh, defendants attorneys in the room. So respectfully, I think this court should affirm, uh, and at a minimum should dismiss all of the, uh, uh, individual defendants because qualifying immunity really hasn't been addressed in the briefs or even today. Thank you. Thank you. Thank you. Getting back to judge Grant's question about what evidence, um, would show that this is this, but it really wasn't the decision about COVID-19 food safety protocols. I would refer the court to, uh, uh, the appellant's primary brief, pages 19 through 23, where I gave, give very detailed four and a half pages of evidentiary analysis under that as to why a jury could find that this was not about that, that we have a right to a jury trial under prong three, um, that's prong three. It's, it's a question of fact for the jury. It's not a question of law for the court to decide such as in, in Pickering. Secondly, as to judge Marcus's comment about this being a mixed motive case, I agree as well, but that goes to prong for the, but for test, uh, which refer, if you look at Bryson versus way cross Ray cross, um, it, it, it describes the, um, But for test, um, and it, it must show that the, the employer must show that it's legitimate reason, standing alone would have induced it to make the same decision. In other words, There's Marcus also assumed for the purposes of his question that we were applying Pickering. So with respect to that, doesn't Mangieri really decide that question at least implicitly implicitly about whether Pickering applies here? Oh, you have to get through Pickering to get to stage three and four. So I, can you ask me, can you repeat your question? Cause I didn't quite hear it. In the Mangieri case, doesn't that, doesn't that suggest that we're in Umber territory and we're not going, we're not going into the four part test that you're suggesting. Oh, well, I mean, I think, I think judge Marcus was suggesting that that Umber is applying and does apply. And I really, it's a question of where on the spectrum, Mr. Oakes falls as an independent contractor. Um, in this case, if he's, you know, he's not operating on site, you know, wearing a, you know, the Lee school district uniform, uh, you know, in a kiosk somewhere, uh, making comments. He's not inside the halls of Lee school district causing trouble and disrupting his fellow coworkers, nor did Mr. Oakes stand outside of the school district and go to a meeting and disparage the Lee County school district itself. Those are the types of things that might, you know, make it different. But here, uh, uh, Mr. Oakes was speaking. Um, he, he didn't do those things. Um, I do want to, I don't know if I answered your question, but I do want to make one, one important point is I, I think the question here under Pickering is when the court has a right to decide Pickering as a matter of law, their right is to balance the speech, free speech rights of the individual against the speech related efficiency justice interests and justifications by the school district under this Garcetti versus Tobias and also green versus Finkelstein. This school district had to present its justification. It said its justification did not have to do with speech. Once that happened, what right does this, does the district court have to come in and say, Oh, well, those weren't the adequate justifications. I'm going to come up with these three new ones that are based on speech. Isn't that the district court meddling in the affairs, the legislative and executive processes of a local state agency? Pickering doesn't give the district court the right to decide the adequate justifications. It gives the court the right to balance the justifications. And here the school district hung its hat and circled this wagon around the fact that this had nothing to do with speech. It had to do with whether or not based on an objective, supposedly objective investigation, Oaks farms had sufficient food safety protocols. That is not a small. Let me read to you what a superintendent Adkins said. As I read it, he said, he summarizes you this way. And I'm quoting now, this is founded docket entry, one 43 to 67 68 quote Oak farms perceived lack of concern regarding the easy transmission of COVID and Mr. Oaks belief that COVID is not real in light of the fact that Oak's farms delivers food products to school. School children does not comport with the district's concerns for the health safety and welfare of the children in our community and the community at large. Remember when he made that statement, that certainly suggests pretty strongly that Mr. Oaks comments about COVID were basic to what triggered the inquiry, the asking for more documentation itself, but I don't see how you can tease the speech out from the, the act of the, uh, of Lee County. I can see how your honor. And that's the investigation itself. It's a superseding or an intervening call. It's an intervening event. Presumably had, had, had the investigation gone the other way and it was an objective investigation and they, they, they had the protocols. Presumably they're the Oaks would have kept the contract. They had, they didn't, they ultimately, let me ask the question this way. Yeah. Why do you think that they terminated the contract because of his comments about George Floyd? I think they terminated the contract because at the time there was, um, uh, uh, fear by government agencies that the pitchfork crowd, there was a, it was because of the comments Mr. Oaks made about his views concerning black lives matter, George Floyd, et cetera. That's why you think they terminated it and COVID was a cover. I think, and that's why, that's why that's your view, isn't it? That is. And that's why we should get to prong three. But let me back up for a second. That being the case isn't speech at the heart of this. Of course it is. That's why we filed a 1983 action. So why isn't this a Pickering case? It is a Pickering case followed, followed by it, followed by a Mount healthy case on three sub substantial factor case followed by a Mount healthy prong for, um, um, but, but Fortas case under prong two, they had a chance to make this about speech. The school district did. They chose not to. They chose to make it about an objective investigation about whether there was food safety protocols. They made that justification to the court. The court did not have a right to decide that that wasn't good enough. And I'm going to come up with three different justifications. Otherwise they're going to, they're going to lose. The school district loses on Pickering and Oaks wins on Pickering. And we go to prong three. Thank you very much. Thank you. Thank you.